3.18mj300EMT

**ATTACHMENT C**
**AFFIDAVIT**

Your affiant, Kimberly A. Suhi, being duly sworn, deposes and states the following:

1.     Your affiant is a special agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF") assigned to the Tampa Field Division, Pensacola Field Office, and has been employed as such for approximately 15 years.  I am charged with the investigation and enforcement of violations of federal criminal laws pertaining to firearms and controlled substances.  I attended the Criminal Investigator Training Program at the Federal Law Enforcement Training Center ("FLETC"), in Glynco, Georgia, for approximately 10 weeks in 2003, where I received training and instruction as a special agent, including firearms training, the execution of search and arrest warrants, investigative techniques, and legal instruction which covered Fourth Amendment searches and seizures. Subsequently, for approximately 14 weeks in 2003, I attended specialized training known as New Professional Training through ATF at FLETC, where I received instruction in firearms technology and identification, firearms trafficking, explosives, and arson.

2.     I have participated in investigations of individuals who have violated state and federal laws, particularly those laws found in Titles 18 and 21 of the United States Code.  Further, I have participated in the execution of search

warrants wherein firearms, ammunition, large amounts of narcotics, currency, drug paraphernalia, and records of firearms and narcotics trafficking have been recovered. As a part of my duties, I have conducted and participated in the arrests of firearms and narcotics law violators. In addition, I have testified on several occasions in grand jury proceedings, where my testimony has contributed to the indictment of numerous individuals. Additionally, I have had conversations with other experienced agents regarding firearms and narcotics trafficking activities and the many different enforcement methods used to combat firearms and narcotics trafficking.

3.      This affidavit is made in support of an application for a search warrant to search a cellular telephone, more specifically described as:

**Attachment A** – Alcatel, Model 5044C, FCC ID: 2ACCJB079, IMEI: 015075003795577, containing SIM Card: Cricket 8901150327 7192415195 and Micro SD Card: UD16GU11R90SFMC2H16EK.

That is, this affidavit is made in support of authorization to search this cellular telephone for evidence of the following violations: possession of a firearm and ammunition by a convicted felon, in violation of Title 18, United States Code, Section 922(g)(1). Pursuant to the warrant sought, I seek authority to search the cellular telephone by activating and retrieving any telephone number assigned to it, and retrieving all information and data stored on it.

4.     The information contained in this affidavit was obtained during the course of my investigation of the conduct of Leroy Finklea and others, and/or is based upon information provided to me by other law enforcement officers.  Since this affidavit is for the limited purpose of establishing probable cause, I have not included every fact known about this investigation, but rather only those facts I believe are necessary to establish probable cause for the requested search warrant.

## **PROBABLE CAUSE**

5.     On or about January 25, 2018, Pensacola Police Department ("PPD") Officer Jose Matos initiated a traffic stop on a vehicle at the intersection of North Davis Highway and East Gadsden Street.  After Officer Matos relayed the license plate to the dispatcher, the vehicle left at a high rate of speed.  Officer Matos then pursued the Chevrolet truck while using his patrol vehicle's lights and sirens.  The Chevrolet truck eventually came to a stop after running off the road at the intersection of North Hayne Street and East Wright Street.  At that point, the driver and passenger doors of the Chevrolet truck opened, and Officer Matos gave verbal commands to the driver and the passenger to remain inside the vehicle.  However, the driver, later identified as Marcus Steven Finklea (hereinafter referred to as "M. FINKLEA"), exited the vehicle through the passenger door, jumped over a fence, and fled the area on foot.

3

6.     Officer Matos then made contact with the passenger of the truck, M. FINKLEA's girlfriend. She stated that her boyfriend "dropped the gun and ran." She was detained and placed inside Officer Matos's patrol vehicle. Officer Matos then photographed the firearm, which was laying on the ground next to the passenger door where M. FINKLEA fled. A cellular telephone was also located on the ground next to the firearm. The firearm recovered was a Star 9 mm pistol that had been reported stolen out of Daphne, Alabama. Additionally, a glass smoking device was also located on the driver's side floorboard.

7.     While officers were circulating the area looking for M. FINKLEA, M. FINKLEA was observed running in the area of 116 North Tarragona Street. In an effort to keep track of M. FINKLEA, a PPD K-9 was deployed and tracked M. FINKLEA to the southernmost part of 116 North Tarragona Street. Thereafter, M. FINKLEA was taken into custody. Following his apprehension, another cellular telephone, two grams of suspected methamphetamine, and two grams of suspected marijuana were recovered from M. FINKLEA's pants' pocket. Thereafter, M. FINKLEA was arrested for various charges, including fleeing and attempting to elude, possession of a firearm by a convicted felon, dealing in stolen property, resisting an officer without violence, possession of methamphetamine, possession of less than twenty grams of marijuana, and possession of drug paraphernalia.

4

8.      After waiving his *Miranda* rights, M. FINKLEA agreed to speak with police. M. FINKLEA stated that when he crashed the vehicle, he fled the area on foot. M. FINKLEA was asked several questions regarding the firearm, but insisted each time that neither his DNA, nor his fingerprints would be found on the firearm. When M. FINKLEA was shown two cellular telephones that were recovered, M. FINKLEA confirmed that the cellular telephones were his. M. FINKLEA was then shown a copy of a photograph depicting his cellular telephone beside the firearm, and asked if he could explain how his cellular telephone ended up so close to a stolen firearm, but he was unable to provide an explanation.

9.      On or about May 2, 2018, M. FINKLEA pleaded guilty to possession of a firearm and ammunition by a convicted felon, in violation of Title 18, United States Code, Section 922(g). At this time, M. FINKLEA entered into a plea and cooperation agreement with the government.

10.     Following M. FINKLEA's plea, your affiant met with and spoke to M. FINKLEA on the telephone on multiple occasions. During these conversations, M. FINKLEA initially stated that he received the firearm with which he was arrested from a friend, but later agreed that the firearm was one of other firearms stolen from Daphne, Alabama. M. FINKLEA also admitted to breaking into other houses, but stated that he did not steal any firearms from the other houses. M. FINKLEA approximated that he stole two hundred firearms from Daphne,

Alabama, with his brother Leroy Finklea (hereinafter referred to as "L. FINKLEA").

11.      When asked specifically to talk about the circumstances surrounding the firearms stolen from Daphne, Alabama, M. FINKLEA stated that he was contacted by his brother, L. FINKLEA, who asked him if he wanted to do a job with him. M. FINKLEA stated that he agreed, so L. FINKLEA picked M. FINKLEA and his girlfriend up.  M. FINKLEA stated that they went to his brother's house, as L. FINKLEA told M. FINKLEA that he had something he wanted to show him.  M. FINKLEA stated that, when they arrived at L. FINKLEA's house, L. FINKLEA and another person named "Marcus" (not M. FINKLEA) had several firearms laid out on the floor inside of the house.  M. FINKLEA stated that the other Marcus had helped L. FINKLEA steal the firearms the night before.

12.      M. FINKLEA stated that, later that night, they (L. FINKLEA, M. FINKLEA, and the girlfriend) drove to Daphne, Alabama, and went to a house near a park.  M. FINKLEA stated that L. FINKLEA did not tell him how he located this house, but assumed that he stumbled across the location while doing tree service work or heard about the location from someone else. M. FINKLEA stated that L. FINKLEA owns Simplicity Tree Service and travels all over the place to work. When they arrived at the location, M. FINKLEA stated that L.

FINKLEA backed down the back driveway of the location, but part of the driveway was blocked by a chain going across it.  L. FINKLEA told M. FINKLEA to get out of the truck and remove the chain so that he could back in.  When M. FINKLEA was having trouble removing the chain, L. FINKLEA exited the truck and told M. FINKLEA that he only had to disconnect the chain.  M. FINKLEA stated that he examined the chain and realized that L. FINKLEA was correct, so he disconnected the chain.  L. FINKLEA then backed the truck a short distance down the driveway.

13.    M. FINKLEA stated that they approached what appeared to be a shed, but a blue tarp was covering a portion of the roof and door to the shed.  L. FINKLEA entered the shed, and only had to push the door open.  When M. FINKLEA went inside, L. FINKLEA told him to stay outside and load everything into the truck.  M. FINKLEA stated that there were several firearms lined up ready to be loaded. M. FINKLEA stated that, once everything was loaded, L. FINKLEA asked for help to load a safe onto the truck.  M. FINKLEA described the safe as very heavy and stated that L. FINKLEA had the safe partially covered by a blanket, as if he were concealing what they were loading onto the truck.

14.    On the way back to Pensacola, Florida, M. FINKLEA stated that he and L. FINKLEA discussed how much money they were going to have and discussed what they were going to buy with that money. When they arrived back at

his brother's house, M. FINKLEA stated that they unloaded all of the firearms. M. FINKLEA stated that, because the firearms from the night before were inside the residence on the kitchen floor, they placed the new firearms on a tarp in the backyard. M. FINKLEA stated that the other Marcus had removed some of the firearms from the night before, and had taken them to his house.

15.·   M. FINKLEA stated that they unloaded the safe and put it in the back yard, as well.  The other items stolen from the residence were divided between M. FINKLEA and L. FINKLEA as they were coming off the truck. . M. FINKLEA stated that they unloaded several pieces of luggage, each containing unknown items.  M. FINKLEA stated that, before opening the suitcases, they divided them. M. FINKLEA stated that some of the suitcases contained firearms and ammunition, and some of them contained clothes and other items. M. FINKLEA stated that his brother, L. FINKLEA, attempted to open the safe for a while, but M. FINKLEA and his girlfriend left the house before the safe was opened to get something to eat and to take a nap.

16.    A couple of hours later, M. FINKLEA and his girlfriend returned to L. FINKLEA's house, and L. FINKLEA had opened the safe.  .M. FINKLEA stated that L. FINKLEA was pretending to have just opened the safe as they were arriving, but L. FINKLEA had already opened the safe and removed some money, as there were empty envelopes and a money band outside of the safe on the

ground.  M. FINKLEA stated that he observed money and jewelry inside the safe. Initially, M. FINKLEA stated that L. FINKLEA initially gave him $15,000.00 in cash, but later gave him more.  M. FINKLEA stated that there was approximately $40-50,000.00 inside the safe.

17.    M. FINKLEA stated that his brother, L. FINKLEA, told him he did not want any part in selling the firearms, so M. FINKLEA paid his brother L. FINKLEA $2,000.00 for L. FINKLEA's share of the firearms. M. FINKLEA stated that he rented a storage unit, and stored the firearms there until he was able to sell them all.  At some point, M. FINKLEA stated that he got scared and started selling the firearms off in large quantities, 30 to 40 at a time. When he had about 80 firearms left, M. FINKLEA took these firearms to the house where he and his girlfriend were staying. M. FINKLEA discussed a number of individuals he sold firearms to, but to date, only approximately four firearms have been recovered.

18.    On or about September 18, 2018, a federal grand jury sitting in United States District Court for the Northern District of Florida indicted L. FINKLEA, charging him with a violation of Title 18, United States Code, Section 922(g)(1), possession of a firearm by a convicted felon.

19.    On or about October 23, 2018, members of the Escambia County Sheriff's Office (hereinafter "ECSO") located L. FINKLEA at the Mayfair Hotel in Pensacola, Florida.   L. FINKLEA was arrested in connection with the

indictment returned by the grand jury. Prior to being transported, ECSO Inv. Brett McCormack called me and advised of the arrest of L. FINKLEA. I asked to speak with L. FINKLEA by telephone, as I was out of town at the time of L. FINKLEA's arrest. I identified myself to L. FINKLEA and told him that his *Miranda* rights have not been told to him. I told L. FINKLEA that I did not want him to answer any questions, and that I only wanted to explain to him what was happening and why he was being arrested. I told L. FINKLEA that he was being arrested in connection with several firearms stolen from Daphne, Alabama. I told L. FINKLEA that his brother, M. FINKLEA, implicated him in the theft of the firearms, as well as other items. I informed L. FINKLEA that my number one goal was to recover as many of the firearms as possible, and I really wanted L. FINKELA to cooperate with law enforcement to recover as many of the firearms. I asked L. FINKLEA whether he understood everything that had been said to him and asked if he wished to cooperate. L. FINKLEA stated that he did understand and agreed to cooperate with Inv. McCormack until I could return.

20.    I then spoke with Inv. McCormack and informed him that L. FINKLEA wished to cooperate. L. FINKLEA was transported to ECSO to be interviewed. Prior to being interviewed, L. FINKLEA was read his *Miranda* rights, which he waived and agreed to speak with law enforcement. L. FINKLEA stated that his brother, M. FINKLEA, was responsible for the theft of the firearms.

10

L. FINKLEA stated that he loaned his brother his truck, and his brother brought back several firearms and jewelry. L. FINKLEA stated that his brother gave him some of the jewelry in exchange for the use of his truck. L. FINKLEA stated that he was still in possession of some of the jewelry, and gave Inv. McCormack consent to search his hotel room to retrieve the jewelry.

21.     When L. FINKLEA was arrested on October 23, 2018, he was in possession of the cellular telephone listed in Attachment A. This cellular telephone was seized by Inv. McCormack and turned over to me for further processing.

22.     According to records obtained, L. FINKLEA has at least the following felony convictions:

A.      July 26, 2005 – Burglary of Unoccupied Conveyance;

B.      December 8, 2005 – Grand Theft Auto;

C.      November 3, 2006 – Burglary of Unoccupied Dwelling and Grand Theft;

D.      November 3, 2006 – Grand Theft;

E.      November 3, 2006 – Grand Theft;

F.      November 3, 2006 – Fleeing or Attempting to Elude a Law Enforcement Officer;

11

      G.      November 3, 2006 – Grand Theft Auto (2 Counts) and Grand Theft;

      H.      April 14, 2010 – Fleeing or Attempting to Elude LEO; and

      I.      April 14, 2009 – Resisting Officer without Violence.

23.   During the course of my training and experience, and through conversations with other more experienced law enforcement officers, I have learned of various methods used by burglars and thieves to: mark locations they wish to burglarize, take pictures of such locations, plan how to burglarize, and take pictures of the various items to either barter or brag.  Based on my training and experience, and through conversations with other officers and agents, I know the following:

      (a)     Burglars and thieves often utilize cellular telephones to facilitate communication with co-conspirators and/or store telephone numbers/addresses of associates;

      (b)     Burglars and thieves often utilize multiple cellular telephones in an effort to compartmentalize their illegal activity.  Multiple cellular telephones are often utilized in an effort to maintain anonymity;

      (c)     Burglars and thieves maintain records, receipts, notes, ledgers, and other items relating to the transportation, ordering, sale, and distribution

of their stolen items, which are usually maintained where they have ready access to them and which are often stored on digital media;

(d)     Burglars and thieves commonly maintain addresses or telephone numbers in devices which list names, addresses, and/or telephone numbers of their associates; such records are normally maintained within places/things under their control;

(e)     Burglars and thieves take or cause to be taken photographs of themselves, their associates, their property, and the stolen goods they distribute, and often maintain these photographs within places/things under their control, including on cellular devices;

(f)     Burglars and thieves commonly use cellular telephones to communicate with their criminal associates, and those telephones are commonly carried with them or kept at locations under their custody and control, such as at their residences and in their vehicles, and contain names, numbers and other information stored in the telephones; and

(g)     Further, I have been involved in investigations, and have been made aware of investigations, in which individuals who possessed firearms and/or other stolen items took photographs of themselves with the firearms and/or other stolen items, and said photographs were recovered from cellular devices.

13

24.     Based upon the information above, I respectfully submit and believe that there is probable cause to believe that violations of Title 18, United States Code, Section 922(g)(1), have occurred and that evidence of said offenses, more specifically set forth in Attachment B, will be found on the cellular telephone described in Attachment A.  As a result, I ask this Court to authorize a warrant authorizing a search of said cellular telephone.

25.     I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge and belief.

Respectfully submitted,

KIMBERLY A. SUHI,
Special Agent
United States Bureau of Alcohol,
Tobacco, Firearms and Explosives

Subscribed and sworn to before me this \_\_\_\_ day of November 2018.

Elizabeth M. Timothy
Chief United States Magistrate Judge
Northern District of Florida

14